The Honorable, the judges of the United States Court of Appeals for the Fourth Circuit. Oyez, oyez, oyez, all persons having any manner or form of business before the Honorable, the United States Court of Appeals for the Fourth Circuit are admonished to draw to give their attention for the court is now sitting. God save the United States and this Honorable Court. All right, good afternoon. We have what, Mr. Boutrous and Mr. Gupta. Yes, Your Honor. Yeah, we'll hear the case of Alig v. Quicken Loans and we'll start with you, Mr. Boutrous, and hear from you first. Thank you, Judge Niemeyer, and may it please the court, Theodore Boutrous, for appellants. I'd like to reserve three minutes for rebuttal. This court should reverse the $10 million class action judgment in this case because it's legally deficient in multiple ways. Seeking to avoid individualized issues and secure class certification, the plaintiffs convinced the district court below to adopt their radical interpretations of the West Virginia Consumer Credit and Protection Act and contract law almost verbatim. But now they've largely abandoned those legally baseless theories on appeal, and for good reason. As a matter of West Virginia law, in this court's decisions in cases like McFarland applying it, Quicken Loans' practice of including the borrower's estimate of the value of their was not an unconscionable practice that induced homeowners to do anything, much less cause them to enter into the loan refinance transactions at issue. Indeed, West Virginia law and the uniform standards of professional appraisal practice, so-called USPAP, expressly authorized that practice during the class period, and there's no evidence, not a stitch in the record, that the plaintiffs were induced, that anyone was induced to do anything. And in fact, all the evidence is to the contrary. The only evidence in the record on this point is from Mr. Clark, an absent class member who opted out because he viewed himself as having been treated well. And this is at page 489 of the joint appendix. He said he would have consummated the transaction had he known that his own estimate of value was given to the appraiser. Plaintiffs themselves gave no testimony at all that they would have acted any differently had they known that that estimate of value was provided to the appraiser. I'd like to focus on three particular issues that we respectfully submit require reversal. First, as I mentioned, on the statutory consumer credit claim, it fails because as a matter of law, Quicken Loans engaged in no unconscionable conduct. During the class period, this practice of including the borrower's estimate of value on the appraisal form was indisputably expressly authorized by the USPAP standards, the Uniform Appraisal Standards. In West Virginia law, and plaintiffs do not even address this, West Virginia statute that specifically, as this court said in McFarland, targets predatory lending, section 31-17-8, specifically incorporates those USPAP standards and says that lenders can rely on appraisals that conform to those standards that authorize the very conduct that's at the heart of this case. And I submit, your honors, that as a matter of law, one cannot deem something unconscionable that conforms to industry practice, uniform standards, and where the law of the state authorizes the conduct. Unconscionable conduct is conduct that's so over the top, that's so outrageous, that it shocks the conscience. And clearly, conduct that conforms to the law, that's authorized. What state law did you say authorized the use of those standards? It's the West Virginia Code section, your honor, which I think is dispositive on the inducement portion of this, as the statute in West Virginia that specifically targets predatory lending. And that statute expressly says that, let me give you the quote, that it authorizes lenders to rely on appraisals, quote, prepared in compliance with the Uniform Appraisal Standards. So the law at the time incorporated those Uniform Standards that permitted this practice. And the district court nonetheless declared that that practice that West Virginia law authorized was per se unconscionable. And there was simply no basis for doing that. And then imposed this $10 million penalty retroactively for conduct that conformed to the law. And that's just pure error. And as this court well knows, the role of the district court was not to break new ground or declare something unconscionable or unlawful that the state statute. Well, let me, I want to ask you a question, at least in terms of understanding where we are. It seems to me you are describing substantive unconscionability. That's not required under the West Virginia Consumer Protection Act. In fact, my following scenes indicate quite clearly that when you're dealing with unconscionability in terms of inducement, you don't need to show substantive unconscionability. And that, the fact that the conduct is lawful, that's what the Consumer Protection Act is covering. It doesn't, that doesn't exonerate you just because it's lawful conduct you're doing. So isn't there a distinction here to be shown when you're dealing with unconscionability that's inducement as opposed to substantive unconscionability? There definitely is, your honor. But here, the practice that is supposed to be per se unconscionable was one that was authorized by state law. So it's not that the ultimate agreement was unconscionable substantively. That's not what I'm arguing. They claim that the practice of providing the borrower's estimate of value was unconscionable and that that practice, not the substance of it, but was so unfair that it is unconscionable. But we submit that if the practice is authorized by state law, if there's a green light to engage in it, it cannot be deemed unconscionable as a matter of law. Here, the district judge did it as a matter of law per se. Yes, Judge Floyd? What about the issue or allegation in the case about the inflated appraisals? Isn't that the unconscionable conduct we're talking about or is it not? It's not, your honor. That's what's just, if I may suggest, just ridiculous about this case. The claim is not and there's no proof that the appraisals were inflated or unfair or biased in any way. And in fact, the appraisals, the experts all agreed on both sides. The borrower's estimate of value and the claim is not that anyone was actually injured. It was that the mere putting the estimate of value on the form was the unconscionable practice. And the plaintiffs themselves didn't testify that they wouldn't have gone forward with the transaction had they known that that information was given to the appraiser. They don't claim that they were injured. They benefited from the transactions. They reduced their payments. They paid off debt. So this isn't a case where, like McFarland, where someone said that the appraisal was inflated and they relied on that and that they were injured. This is just, these words were on the form and this is class-wide. The court held everybody gets a $3,500 penalty even if they weren't harmed, even if they benefited. And there's no testimony, not even from the main plaintiffs, saying if I had known that I would not have gone through with the transaction. And that brings me to the inducement, unconscionable inducement. Because here, plaintiffs- Tell me what you were just talking about then. I mean, my understanding, this case is about unconscionability from inducement. You said this brings me to it. What were you just talking about? I was talking about there, Judge Winn, the question of is the conduct itself unconscionable as a matter of law? That's step one. I think we made it clear that's not necessary. McFarland indicates that's not necessary to show substantive unconscionability. You've been talking about that the whole time. The question here goes to the inducement aspect of it in terms of case law in West Virginia. And McFarland, while it may seem to, maybe you can clarify, it looks like to me, this is a case that's really kind of going a step further than McFarland in terms of the inducement. Give me your thoughts on inducement. Yes, Your Honor, on inducement. So you have to have unconscionable conduct that caused, and this is what the court said in McFarland, proof that it caused the borrower to consummate the transaction. And that's what the White case says from the Virginia Supreme Court of Appeals as well. So here, where either the plaintiffs needed to prove that they were induced, and we all know what induce means. It means persuade you to do something. That's what this court held in McFarland explicitly on this statute. And so the burden on the plaintiff was to put in evidence that either they relied on a specific misrepresentation. They claimed there were misrepresentations on page 38 of their brief. They have no evidence of reliance. So that's prong one. Or that there was concealment of a material fact that had they known about it, they would have acted differently. They wouldn't have gone through with the transaction. There's absolutely not one whit of evidence. Plaintiffs don't even try to say there is. They claim that influence means, first, they convince the district judge that to read into the statute, Judge Winn, that it's not just induced, but or furthered the transaction. Now I think Mr. Gupta has recognized that that's just rewriting the statute. But the plaintiffs now have gone farther. They say it's just as long as something was part of the process. So anything that was part of the process, even if it had no effect on the borrower, even if nothing would have changed, is somehow inducement. And that's just as a matter of law, Your Honors, incorrect as a matter of plain meaning. And in McFarland, the court said this court is not going to assume that the West Virginia Supreme Court of Appeals is going to have to prove reliance in this case. They do not, Your Honor. To the extent they're relying on affirmative misrepresentations, which they say in their brief they are, they do. They fail to do that. They don't even try. But we recognize that under the white case and under concealment cases, they could prove causation. And the white case that they rely on says that where it's concealment, then the requirement is to prove that the transaction would not have happened but for the concealed fact. Plaintiffs have manifestly failed to do that. They didn't even try. They did not put in any evidence, not even from the named plaintiffs, that the named plaintiffs, we don't have a declaration from a named plaintiff saying, if I had known that my own estimate of value had gone to the appraiser, I would not have gone through with the transaction. And in fact, just saying. I thought White spoke of causality from the terms of as a result of. Yes. You mentioned the but-for causation. I don't know if I saw that language. But you know it's better not to. I thought it said as a result of. That's what the statute said, Your Honor. But in interpreting as a result of, the court said there's two, that that's a causation standard. And that's what McFarland held with respect to. This was a different prong of the Consumer Credit Act. But McFarland said they must prove causation. That they caused, the unconscionable conduct caused them to enter into the bargain. And here's what McFarland, excuse me, White said on page 837. It said where concealment, suppression, or omission is alleged. And the causal connection between the deceptive act and the ascertainable loss is established by presentation of facts showing the deceptive conduct was the proximate cause of the loss. In other words, the facts have to establish that but for the deceptive conduct or practice, a reasonable consumer would not have purchased the product or incurred the loss. And plaintiffs defaulted on that. They didn't even try. The plaintiffs themselves, named plaintiffs, did not put in any evidence of that. They put in no expert testimony that a the deal now that I know that you gave it to the appraiser. And these appraisers, I need to make this, emphasize this point. These appraisers have a professional obligation to act independently to not be influenced by an estimate of value. They have to swear to that. In terms of Judge Floyd's question regarding reliance, if the allegation deals with concealment or some type of omission when you do that, it seems to me that White makes it clear that you don't need reliance. And which goes to the question of, is there any need to inquire into the plaintiff's subjective mind in the case? Well, I mean, but I'm looking straight at White in terms of it. And the question is, it wasn't required there to inquire into the subjective mind or how you would deal with the case. Well, there would be various ways to prove. As I read the passage from White that said, when it's concealment, you still have to show but for causation. And the plaintiffs, one would think, would at least have to say, well, I wouldn't have gone. They're representing a class. We don't know what any of the people, the thousands of people who are in the class, were even thinking or doing, whether they even were injured. But Judge Wynne, it's very clear from White, and this is similar to the fraudulent concealment context, there must be proof from the plaintiffs. And then establishing that a consumer would have not gone forward with the transaction, as I mentioned, on this record. Which, by the way, is a pretty extreme result. Summary judgment based on a per se finding of unconscionable inducement where there's no evidence from the plaintiffs themselves that they would have acted any differently or that they were even injured. But as I mentioned at the outset, Mr. Clark is the only sworn testimony in the record. And he said he would not have acted differently. And so there's no way this court can affirm this judgment. And it's up to the court. It seems to me that from all the real estate transactions I'm familiar with, the borrower would want their value to go to the appraisal so that the loan would be approved. In other words, they would almost wish for influence on the appraiser to follow what they thought was the value. But the appraisal is not for the borrower. The appraiser is for the bank or the lender. And the bank or the lender could even forego an appraisal and just make the loan based on cash flow or whatever other items they relied on. So it troubles me to conclude that these borrowers were induced to get into the transaction because of the failure to disclose something that was beneficial to the borrowers or would have been beneficial. Exactly, Your Honor. And there's evidence in the record that borrowers would say to the appraisers when the appraisers would go to the house, you know, my house is worth this and that. And they wanted them to know what the value was. The borrowers, after all, gave the estimate of value to Quicken Loans, presumably in good faith and honestly. And so you're absolutely right. I think that's why there's nothing in the record of a borrower saying they wouldn't have wanted that passed on. Let me ask you on that point. I mean, that's very logical if we were talking about fraudulent concealment. We are talking about a lot of time people may benefit from something, but the Protection Act has a whole different purpose in it and a different meaning of it. And when you look at language from Brown, in particular, when you're dealing with a concealment type case, Brown speaks to the contribution of the formation of a conclusion in the plainest mind that that is enough. And yet it is not required here to have fraudulent inducement. That's not required in order to be able to prove unconscionable inducement. No, Your Honor, it's unconscionable inducement. And as this court in McFarland said, it's active concealment and concealment of a I'm glad you did, because it emphasizes that unconscionable inducement is highly fact-specific and depends on the facts of the particular individual's case. Here, we don't know anything about anybody else, and all we know is about the Alecs and the Shays that they weren't injured, that they wouldn't have acted any differently. If we focus that this arises in a West Virginia law, which deals with the Consumer Protection Act, the fact of benefit and harm doesn't really come into play in that act. I mean, that act protects certain conduct that can occur that may cause harm in a broader, I guess, in terms of the citizens. So while, yeah, you may have individuals that benefited from it, but nonetheless, it does not sanction that an entity can nonetheless violate it because they say, they didn't get hurt by the fact that we went and gave inflated appraisals and gave them money far more than the value of their houses and stuff. They had extra money on it. That's exactly what the act is seeking to protect. It's not to say it's unlawful in some way. It's a Consumer Protection Act. Your Honor, first of all- And I mean, when you think about it in terms of you got an appraiser that's supposed to be objective, and no one has said to these people that this thing is not I guess at the end of the day, they think their house really is worth this because some appraiser has come back and said this. Your Honor, well, the appraisers here all testified they weren't influenced by the estimate of value. There's no evidence of what the court just outlined, that these appraisals were not appropriate or inflated or that the loans were any more than they were justified under the facts. And just one last factor, again, the consumer statute, this court held in McFarland. It requires proof causation of harm, of loss. Brown and White say there's a balance here. We don't want there to be cases where you're interfering with commerce and with transactions. And that's what this is. There's no injury. And Judge Wendell, it would be a different case if it was as you outlined it. All right. Thank you. Well, did you have some further judgment? No. Okay. While we pick you back up, you have a little bit of rebuttal. Mr. Gupta, it's your turn now. Thank you, Dave. Please look at the court. This case was first filed in West Virginia State Court in 2012. It came before this panel in 2013. And at that time, the issue with jurisdiction, Quicken fought to keep this case in federal court in Judge Bailey's courtroom. Now, Quicken comes to this court on appeal and challenges virtually every aspect of the district court's management of this case over that period. But I think as the discussion so far has shown, the appeal really boils down to a threshold question on which the district court, as a federal district court sitting in diversity, was required to predict what the West Virginia Supreme Court of Appeals would conclude about the meaning of West Virginia's The district court did that, and it held correctly that Quicken's act of providing appraisals without disclosing the inherent unreliability was a misrepresentation, an omission, that constituted unconscionable inducement under the statute. What Quicken is asking you to do is, I think, three things that should concern you. First, they're asking you to erect a rule of state substantive law that the state itself has not adopted, a requirement of reliance, an inquiry that turns on the subjective motivations of the consumer. Mr. Gopka, I think that that's a slippery slope. As I understood the argument, and I think we ought to face the argument made head on, one is that the conduct itself could not be characterized as unconscionable as a matter of law because of the arguments made, but I think the more substantive argument that the appellants are making, if I understand correctly, is the causation that there's no evidence that they were induced. The word induced comes right from the statute, and that they were induced to go through with this transaction because of the omission, and the omission, what the White case described that, the nature of that causation. In other words, you need something to indicate that the plaintiffs wouldn't have gone through had that disclosure been made. Right. Judge Niemeyer, I think you're correctly characterizing their argument. So I just wanted to get you off the word reliance. In other words, I wanted to get you on causation. We can bracket off because the parties, there are a lot of disputes about the words, but I think you've correctly characterized the argument. The problem with that argument is it asks the wrong question, and therefore gets the wrong answer. In your formulation and in Mr. Boutros' formulation, the object of the sentence is the consumer, not the agreement, but the question under West Virginia law is whether the agreement has been induced. And if you look at the Brown versus Quicken Loans case that Judge Wynn was talking about, in that case, the practice was the same. The trial court there had held, and I'm going to quote you, that no legitimate purpose is served by providing an appraiser with an estimated value of a property. And then the case went up to the West Virginia Supreme Court of Appeals. Now, it's true that there were other practices at issue there, so I don't think that that case squarely decides the issue before you, but as McFarland said, it comes pretty close. And what the court held there was, and I'm going to quote you now from McFarland at page 284, the court sustained findings of unconscionability in the inducement, and remember, it's the same practice, based entirely on conduct predating acceptance of the contract and allegations going to the fairness of the process. This is what Judge Wynn was talking about. It's not the result of the process and whether it's a substantively unconscionable agreement. It's whether the process itself has been skewed. And I think whatever I'm saying about a mortgage transaction is integrally reliant on the appraisal. I'm sorry, Judge Floyd. Let me ask you this. Even if the Quicken had no duty to disclose the inflated appraisals, assuming they were, aren't they required not to misrepresent the values that they did disclose? Yes, exactly, Judge Floyd. Is that what we're arguing about here? Well, it's not just the values. It's the process. So they charged all of these consumers in the class for an independent appraisal. The whole point of an appraisal is that it's unbiased. The same West Virginia code that Mr. Guttrauss cited you that incorporates the uniform standards, it also makes it illegal to influence the appraisal process. And so the whole point is there has to be an appraisal. The appraisal is independent. That's obviously integral material to the mortgage agreement. That's hard to think of something more integral to a mortgage than determining the price, the actual amount of the mortgage. And then the question under West Virginia law, and it's an objective question as a matter of law, is was that practice unconscionable? And what Judge Bailey concluded based on an extensive survey of cases from around the country and cases in West Virginia is that this is a universally condemned practice. Remember, in Brown versus Quicken loans, which involved the same lender, the West Virginia court said there is no legitimate purpose served by this practice. And the reason that this practice is so condemned is because it skews the process. It results in higher values and can result in people being underwater. I do want to address a concern that Judge Niemeyer raised in a question to my colleague because it's a question that I had coming to this case, which is, well, if the borrowers might be the source of this number, what's the big deal? Because the borrower may want the number to be higher. But I think that's cold comfort. I mean, one of the reasons we got into the subprime mortgage crisis is because there were people who were eager to get into loans. They were eager to have the values be high. And we did away with appraisal and sound underwriting standards. And the result was that people were underwater. Those loans were sold to Wall Street. And the consumer protection statutes are certainly protecting the borrower, protecting the borrower from getting into a loan that is induced through a skewed process, but also protecting the integrity of the entire system. And so the West Virginia legislature passed this statute to protect consumers and to preserve the integrity of the mortgage process. And I think this court's job is, as a court sitting in diversity, is not to erect new rules that make it harder for consumers to approve these claims. This court's job is to predict what the West Virginia Supreme Court of Appeals would do. And I think you can do that modestly here. I think you can take a cue from McFarland. In McFarland, the court said, we're not going to determine the parameters of this claim or the outer boundaries of the claim. But I think what you can do is, if you take McFarland together with Brown versus Quicken loans, I think you can narrowly affirm without creating any new law. And all you have to do is adhere to McFarland's holding. I'm sorry, Judge Floyd. I want to ask you a question about the restitution. Has West Virginia ever held that restitution is an appropriate remedy for a breach of contract claim? And if they haven't, why should we do so now? Well, I think, Judge Floyd, in candor, there is no West Virginia Supreme Court of Appeals case that is directly on point. I don't think either party has pointed you to one. And so what we have said is that Virginia relies on the restatement, restatement of contracts. And that is certainly codified. And what the district court applied here is just the standard traditional restatement rule, which is that a person must pay restitution, must pay an amount equal to the benefit conferred on him. That's restatement, second of contracts, 371. And if the benefits consist simply of a sum of money received by the party for whom the restitution is sought, there's no difficulty in determining that amount. And that's a quotation from the restatement. I would point you to the Realmark case from the West Virginia Supreme Court, which is on page 55 of our brief that shows how West Virginia courts measure restitution. But I do think it is not a question that the Supreme Court of Appeals has squarely confronted. I think the restatement traditional approach, which is shared by courts around the country, is the right one. I also think it's just worth talking about what the facts of this case are. This is a case where they charged each of these people $350 for a skewed appraisal that was not independent. And all the district court said is you get your $350 back. I'm not quite sure what Mr. Boutros is suggesting the methodology should be for calculating restitution, but certainly something more complicated than that. And I just don't know how one would calculate it or what source of law one would rely on. So I think... Your colleague said that West Virginia had essentially incorporated the uniform standards for appraisal practice and therefore made this practice of getting, I suppose, getting the homeowners to give appraisal made all that legal. Do you agree with that? Absolutely not. Thank you for asking me about that. I meant to turn to it. I'm really puzzled by that argument. He's correct that the West Virginia code incorporates those standards, but nowhere do those standards authorize lenders to provide the estimated number for the borrower. In fact, I think the district court found that this practice was led on with the uniform standards and that this is a universally condemned practice. So if anything, the relevant provision of the code to which Mr. Boutros is pointing is subsection M2, which prohibits lenders from seeking to influence the appraisal process. And I think the defense is trying to figure out what is the substantive policy of the state of West Virginia. That's a clue, but I think an even better clue is what the West Virginia courts have said in a case involving this same defendant and this same practice. And the court has no further questions. I do. There was, I seem to recall there is an exact provision that authorizes the borrower to submit the appraisal value to the appraiser so long as the appraiser doesn't agree to follow it and exercises independent judgment. There's no such provision. There's no such provision in West Virginia law. I said in the standards. Let's start with a question. My question was in the standards applicable. I think that there's a confusion about whether... Do you have that before you, sir? I don't have that provision before me. No. All right. That's what I'm asking. And I think there's a confusion about what the standards impose on the appraiser and what is imposed on the lender. And I think that the district court addressed this in some detail. Mr. Kopka, if you would answer my question, I'm trying to find out what the established practice was at the time this conduct occurred. And as I recall, the practice followed was exactly as that authorized. Now, you're saying that isn't so. I can check it, but I'd like to have you address that and not some other argument. Right. Well, Judge Meemer, I'm trying to. And I think the district court went into this in great detail in its decision on June 2016. And one of the defendants here, one of the appraisers, who was the same appraiser in the Brown case, actually conceded. He surrendered his appraisal license. He said Quicken was regularly attempting to influence his appraisals. He was found to have violated the uniform standards. And he went on to characterize the providing of the owner's estimated value as a tip-off. So I think the district court went through this in great detail. This was a uniformly condemned practice. And you don't have to take our word for it. You can take the word of the West Virginia courts in the Quicken loans versus Brown case. Thank you. All right. Excuse me. I have another question. Give me your response. Your colleague had mentioned that there was no proof of harm in this case because of no deposition testimony that a plaintiff would have entered these loans had they known of this process. How do you respond to that? So I think my first response is just to say, in terms of the counterfactual question of what plaintiffs would have done, that's not the right response because it turns on subjective expectations. But certainly, there was harm in the form of the amounts that were charged. There was harm in the skewing of the process. And there was also actual damages. I mean, that's not before you in this appeal. But the ailings were underwater. There were other people for whom there was consequential harm. And there was a process for dealing with that. The question before you, though, is about whether or not the district court was correct in assessing statutory damages for a class-wide practice that skewed the integrity of the system. And so for that kind of claim, don't enter into an individualized inquiry with a consequential harm. If you did that, of course, you couldn't decide it as a matter of law. Are you relying on the district court's idea of this per se unconscibility? No. I mean, I think when the district court says per se, I think the best way to read that is just that the district court made a finding ultimately as a matter of law. The West Virginia Supreme Court of Appeals has been clear that this is a question of law. It is, of course, informed by the factual context in which it arises. But it's ultimately a conclusion of law. And in Brown versus Quicken Loans, the West Virginia court made the unconscionable inducement finding as a matter of law. And the Supreme Court of Appeals affirmed it. I'd like to go back to Judge Niemeyer's question and follow up. He quoted to you what the standards were. And they say they follow those standards. Then you say that it's universally condemned. I mean, how do we reconcile those two things? I mean, I think Quicken is arguing, I think what they're arguing, this is not something that they focused on very much in their brief. But I think what I heard Mr. Butrus arguing is that the standards somehow expressly authorize that practice. I think that's not correct. At best, you could say that the standards don't expressly address and forbid this practice. But Quicken is ignoring the fact, this is what I was trying to say to Judge Niemeyer, ignoring the fact that those standards do not apply to lenders. Lending standards regarding appraiser independence are separate and stronger than the standards set by the appraisal. Well, let me try again, Mr. Gopka. I'm now taking this information from your colleague's brief, but he's quoting the actual standard. He says, the standard expressly permits appraisers to accept assignments in which lenders provided an, quote, owner's estimate of value, close quote, or even an, open quote, approximate or minimum value needed, close quote, so long as reaching those values is not, open quote, a condition of the assignment, period, close quote. Right. Is that the text of the standard? Yeah, I think you've read it, but I think what I'm trying to say- I'm asking you, sir, is that, don't duck the question, is that the text? Yes, I believe so. All right. I believe the district court addressed this at joint appendix, page 398. And what the district court held is the same thing I'm saying, which is, you're just, those are not the standards that are applicable to Quicken. The standards that are applicable to Quicken are the lending standards. Quicken is a lender. And so the question is, is it permissible for the lender- This was a standard of appraisers, of appraisers receiving the value of the house from the owner. And the practice says that can be done so long as the appraiser exercises independent judgment. And that's all I'm trying to get from you. And if that's so, that was an accepted practice at the time. No, incorrect, Judge Niemeyer. The conclusion does not follow from the premise. And I think the district court addressed this in some detail. Why don't you leave the district court alone and just make the argument why it isn't? Sure. Because the standards that are applicable to the lender are more- This is not to the lender. This is an appraisal standard. Correct. This is a standard applicable to provides the ethics appraisers that provide. And it says appraisers may receive that value from the owner. The defendant here is not an appraiser, Judge Niemeyer. The defendant here is a lender. Sir, will you address my question? We're talking about the question of whether the appraisers acted unethically. And the practice that the appraisers followed at this time was consistent with the appraisal standards. No, I think that's wrong, Judge Niemeyer. That's the wrong question. The question is whether or not- I'm asking you that question. I'm not asking what the right question is. You can argue however you wish, but I'm asking you, did the appraisal standards authorize appraisers to receive the values from the homeowners? And so long as they exercised independent judgment. And that's all I'm asking. And you don't seem to want to acknowledge- I've answered that question a few times, I think. Why don't you just answer Judge Niemeyer's question and say, yes, that's what he is saying. Yes, he is correct. But there's a but to that. The appraiser is not the defendant here. What you are dealing with here is the lender. But yes, that may be true for the appraiser could do it, but the lender is the one who's doing this. And that's the distinction that the district court made. And yes, he is correct. Read it all day long. It's exactly what it says, but it doesn't apply to this case because that's not the defendant here. It just says that if an appraiser can do it, yeah, that protects appraisers from doing it and they change the practice on it. So I think what you're saying is it's not forbidden, but that doesn't mean that it's permitted. That's correct. That's correct. And more importantly, the practice at issue here, which is I think what you're saying, the practice here is skewing the appraisal process by the appraiser. And as long as we focus on the lender, we're okay. But if he was suing the appraiser, we'd be at a different ballgame. That's right. You're probably not going to sue him too much. But you know, I'm just. They dropped out of the case. They were defendants earlier, but they're no longer defendants here. If there are no further questions, I'm happy to conclude. Thank you. All right. Thank you very much, Mr. Buchholz. Let me just pick up on this point that Judge Wynn was making. The lender, the statute in West Virginia, section 31-17-8 explicitly says that the lender may rely on an appraisal of the property, and I'm quoting, by an independent third-party appraiser duly licensed in West Virginia and prepared. That's exactly correct. I think you're correct. I think we can all agree to that. Here's the problem. I'm not done, Your Honor. But hold it before you do. I'm just saying, the problem is the focus. Yeah, he can rely on it, but the problem is he's a party to doing it. He's the one that's getting it. The lender's the ones that's getting the overvalue, giving it to the appraiser. And then even when the appraiser doesn't come back the way he wants it, they've got a little scheme where they go back and says, oh, well, you know, you can go up a little higher. You can do a little bit, and they keep ratcheting it up. If we were talking, the appraisers are out of it. Your Honor, first of all, let me read the definitive part that completely refutes Mr. Gupta's argument and respectfully what Your Honor just said. It says an appraisal based on the uniform standards, which authorize the appraiser to consider the borrower's estimate of value as long as they- I'm conceding everything to you on that. I don't think there's a- Then you should reverse.  But listen to what I'm saying. We're not talking about that appraisal per se. We're talking about the actions of the lender. He can't use that as a shield. He can't use that as a shield to say, hey, they can do it, so let's go and do it ourselves and get this up here and then give it to them. They're the ones pushing it. They're the ones who are being sued. Your Honor, there's no evidence whatsoever of that in the record. That's a completely different case, Your Honor. The only practice at issue here- The defendants- Well, let me ask you. Let me just ask one thing. Who are the defendants in this case? Are the appraisers the defendant? Are the appraisers the defendant? That's the end of it. It is the end of it, and you should reverse, Your Honor, because the only practice at issue, it's not inflated appraisals. There's no evidence that the appraisals were skewed. Look, scour the record, Judge Wynn. You will not find a- Tell me, why did we remand in McFarland? If what you were saying, why wasn't that the law in McFarland? Because McFarland said there had to be proof of causation. The proof here would need to be that the borrowers were induced- What was the conduct in McFarland? Wasn't it the same thing? No, not at all, Your Honor. There was an inflated appraisal. The appraisal was $200,000 for a house that was worth less. This is not about- That's why I think, Your Honor, go back and look. This is not about inflated appraisals. There's no evidence the appraisals were skewed. The only practice, Judge Wynn, the only practice is putting the estimate of value on the appraisal order form. We don't even know if the appraisers saw that. There's evidence that they didn't. This is a class action. This court can't affirm a $10 million punishment. It would violate due process where there's no evidence that any of the appraisers here, Your Honor, said that they were not affected and that they were following the standards. Your Honor, I grant you, the case you're describing would be a much different case. That was McFarland. The good news is that we have what you're saying, and I'm going to accept what you're saying, but I will tell you, the facts will bear it out. The question will be, are those the facts in this case here? If they're just as straight up as what you're saying, they'll bear that out. But if they're not, it's not going to come out that way, and I think McFarland informs this, and I believe if your theory was correct, we would have dismissed McFarland. No, Your Honor. I think that if you follow McFarland and apply it to the undisputed facts here as I've described them, which is absolutely accurate, and Mr. Gupta's description is a completely different case, this isn't a subprime mortgage case. It has nothing to do with any of that. So I'm willing to bank on my version of the record, and if the court looks at the record and looks at McFarland, by the way, the Brown case- We've got the record. The record is already set. There's no need to bet on the record. It'll be right in front of us. We'll go through it, okay? I trust you will, Your Honor. Thank you very much. Thank you. All right. Let's call it an end here. Thank you for hearing us. I think we've heard all the points, and they're all well taken, and we'll consider them. Our practice, as you know, is now to heal all wounds. Come on at the bench, and greet counsel heartily, and we do so virtually. We can't come off the bench in this case. We'll resume that practice when we're allowed to, and we hope the two of you come back, and we can repeat. But thank you very much for your arguments. They're well argued, and you held your points, and we'll get back to you. Thank you, Your Honors. We'll take a short recess, stand adjourned, and then resume for our next case. Thank you. The court will take a brief break before hearing the next case.
judges: Paul V. Niemeyer, James A. Wynn Jr., Henry F. Floyd